**UNITED STATES of America,**
**Plaintiff,**

v.

**Laurel Wesley ELLIS, Defendant.**

**Case No. 1:12–CR–91.**

United States District Court,
W.D. Michigan,
Southern Division.

Dec. 19, 2012.

Mark V. Courtade, U.S. Attorney, Grand Rapids, MI, for Plaintiff.

Brian Patrick Lennon, Sarah Riley Howard, Warner Norcross & Judd LLP, Grand Rapids, MI, for Defendant.

1. The Court's fact findings are based on the written record and on the testimony of witnesses at the evidentiary hearing. Many are undisputed. To the extent any facts are dis-

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

ROBERT J. JONKER, District Judge.

### I. INTRODUCTION

On March 12, 2012, police obtained a warrant to search the home of Defendant Laurel Ellis ("Ellis"). During the resulting search, they found 189 marijuana plants growing in Ellis' basement, along with other evidence that Ellis was unlawfully manufacturing marijuana. After the search, police interviewed Ellis at his home and he admitted to the grow operation. On July 26, 2012, Ellis filed the Motion now before the Court (doc. # 29), seeking to suppress the results of the search and his incriminating statements made after the search. He also moves to suppress an incriminating statement police allege he made before the search, but that he denies making at all. The Court conducted an evidentiary hearing on October 4, 2012, and afterwards received supplemental briefing on several points. Having considered all matters of record, the Court finds no basis for suppression and therefore denies Ellis' Motion.

### II. FACT FINDINGS [1]

#### A. Undisputed Facts of the Search Warrant and Confession

On March 12, 2012, Detective Todd Butler ("Butler") applied for a warrant to search Ellis' home. (Search Warrant Aff., doc. # 30–1.) In his application for a warrant, Butler set out three reasons for believing that Ellis was unlawfully growing marijuana in his home: (1) Douglas Kurylowicz had told KANET officers that, just a few days earlier, he had personally ob-

puted, the Court finds that the facts recited here are established by a preponderance of the evidence.

served Ellis growing a large number of marijuana plants in his home; (2) a search of the Law Enforcement Intelligence Network ("LEIN") did not disclose a license from the State of Michigan for Ellis to grow marijuana for medicinal purposes; and (3) upon learning that Butler was going to apply for a warrant to search Ellis' home, Ellis had said, "You are going to be taking me to jail for sure now when you see what is down in the basement." (*Id.* at 3–4.) A magistrate judge reviewed Butler's affidavit and issued the search warrant that evening.

Butler and other officers of the Kent Area Narcotics Enforcement Team ("KANET") executed the search warrant shortly after it issued. (Resp. to Mot. to Suppress Evidence ["Resp."], doc. # 32, at 6.) The officers who searched Ellis' home found 189 marijuana plants growing in the basement, along with other evidence that Ellis was manufacturing marijuana. (*Id.* at 3.) While officers searched Ellis' home, Butler and Ellis walked outside to a police vehicle. (*Id.*) Ellis sat in the front seat of the vehicle. He was not handcuffed or otherwise restrained at the time and the vehicle was unlocked. Butler also told Ellis that he was not under arrest and that he was free to leave the vehicle at any point. Butler then read Ellis the *Miranda* warnings. (*Id.*) Ellis signed a written waiver of rights form, after which he confessed to operating an illegal marijuana grow operation in his basement. (*Id.*)

■■■ Manufacturing marijuana is a crime under both federal law and Michigan state law. *See* 21 U.S.C. § 841 *et seq.*; MICH. COMP. L. ANN. § 335.301 *et seq.* The federal law criminalizing marijuana manufacture is not subject to any exceptions; growing even a single marijuana plant is, *per se*, a federal offense. *See, e.g., United States v. Rigsby*, 943 F.2d 631, 643 (6th Cir.1991) ("Under the present rule, the jury had to find defendant guilty under § 841(a), as it did for possession of a controlled substance based on defendant's manufacture of the single marijuana plant."). The same is true under Michigan law, but the Michigan Medical Marihuana Act ("MMMA"), MICH. COMP. L. § 333.26421 *et seq.*, does establish an affirmative, state-law defense for some manufacturers of medical marijuana. *See* MICH. COMP. L. § 333.26428 (entitled "Medical purpose for use of marihuana as *affirmative defense* in prosecution of patient or primary caregiver ...") (emphasis added). The defense is a narrow one, subject to strict limitations. *People v. King*, 291 Mich.App. 503, 804 N.W.2d 911, 915 (2011); *see also Casias v. Wal–Mart Stores, Inc.*, 764 F.Supp.2d 914, 922 (W.D.Mich.2011), *aff'd*, 695 F.3d 428 (6th Cir.2012). Moreover, the MMMA's affirmative defense "does not abrogate state criminal prohibitions of the manufacturing of marijuana." *King*, 804 N.W.2d at 915.

Ellis does not dispute any of the foregoing facts. Nevertheless, he moves to suppress (1) the physical evidence obtained by execution of the search warrant, (2) his confession, made to Butler in an interview after the warrant had been issued and after he signed a written waiver of his rights; and (3) evidence of a statement he denies making at all, but that others say he made upon learning that Butler was going to apply for a search warrant. (Mot. to Suppress Evidence ("Mot."), doc. # 29, at 1.) His Motion hinges almost entirely on events antecedent to Butler's application for the search warrant.

**B. Facts Leading up to Search Warrant and Confession**

On the evening of March 12, 2012, Butler and a team of KANET officers executed a search warrant at the home of Douglas Kurylowicz ("Kurylowicz"). (Resp., doc. # 32, at 1.) The officers discovered

evidence that Kurylowicz was illegally growing marijuana in his home. (*Id.*) Kurylowicz agreed to speak with the officers and admitted that he had been growing marijuana for several years under the MMMA. (Def.'s Br. in Supp. of Mot. to Suppress Evidence ("Def.'s Br."), doc. # 30, at 3–4.) He also identified Ellis as the person licensed under the MMMA to grow marijuana for him and told police that he had been "inside [Ellis'] residence three or four days ago" and had personally observed that "Ellis had 30–40 marijuana plants [more than] he is allowed per his medical marijuana caregiver card." (*Id.* at 4.) At another point in the police interview, Kurylowicz confirmed that Ellis "is a medical marijuana caregiver but he is way over the number of marijuana plants that he is allowed." (*Id.*)

Butler and several of the KANET agents decided to visit Ellis' home to investigate Kurylowicz's allegations. The officers believed they had probable cause for a warrant to search Ellis' home, but they elected not to apply for a search warrant right away. Instead, they drove straight to Ellis' home to seek his consent to search the premises by conducting a so-called "knock-and-talk." [2] The officers' decision to proceed without a search warrant was the product of several practical considerations: (1) it was already evening when they left Kurylowicz's home; (2) by the standards of rural Kent County, Kurylowicz's home was relatively close to Ellis'; (3)

obtaining a search warrant would have required the officers to spend additional time driving to the station house (a considerable distance), completing an affidavit, and waiting for the warrant to issue; and (4) the officers believed that Ellis would consent to a search of his home, obviating the need for a warrant because, in their experience, citizens more often than not consent to search.

Butler and the other officers reached Ellis' home around 10:00 p.m. When the officers knocked on the door to the residence, Ellis initially grabbed a loaded handgun and took it with him to answer the door. (*Id.* at 5.) When the officers identified themselves as law enforcement personnel, Ellis put the gun away, opened the door, and stepped outside to speak with them. (*Id.*) Butler told Ellis, truthfully, that he had information Ellis was growing marijuana illegally and then asked to search Ellis' home. (Resp., doc. # 32, at 2.) Ellis admitted to participating in Michigan's medical marijuana program, but denied ever selling marijuana illegally. (Report, doc. # 30–2, at 2.) He further demanded that the officers obtain a warrant before searching his home. (*Id.* at 2.) Butler then told Ellis, truthfully, that he would seek a search warrant right away, and that Ellis would be detained while Butler went to the police station to apply for a search warrant. (*Id.* at 2.) Ellis was handcuffed at this time. (*Id.*) When But-

---

**2.** This Court has, in the past, been critical of the knock-and-talk technique as a means for circumventing the Fourth Amendment's warrant requirement. *See, e.g., United States v. Boyd*, 910 F.Supp.2d 995, No. 1:09–cr–192, 2011 WL 9693758 (W.D.Mich. June 29, 2011) (unpublished). In particular, this Court has expressed its concern that the technique is frequently implemented with the purpose and effect of lying to citizens in order to gain entry to private premises. In contrast to those troubling instances, however, the offi-

cers in this case were scrupulously honest and forthcoming with Ellis at all stages of the encounter. The record shows that the officers promptly notified Ellis of their identities and apprised him of their motives and reasons for wanting to search his house. They told him exactly what they were there to do and truthfully explained to him what they would do if he refused to allow them to search the premises. The KANET officers' candor and forthrightness in conducting a knock-and-talk makes their use of the tactic far less questionable from a legal perspective.

ler notified Ellis that he was going to apply for a warrant, Ellis said, "You are gonna be taking me to jail for sure when you see what is down in the basement." (Resp., doc. # 32, at 2.) Ellis denies ever making such a statement, but the Court finds, by a preponderance of the evidence including the testimony of multiple officers, that Ellis made the statement.

At this point, the officers confronted a dilemma. By notifying Ellis of their plans and by detaining him outside, the officers had put anyone inside the home on notice of the impending search. This created a very real risk that individuals still inside the home might destroy evidence while the officers waited for Butler to return with a search warrant. Several of the officers testified that they had participated in investigations where suspects inside a home had flushed full-grown marijuana plants down the toilet as officers were literally at the door waiting for a warrant to issue. To guard against the possibility that evidence would be destroyed in this case, the officers decided to detain Ellis inside his home and check to make sure the premises were otherwise secure. (*See* Resp., doc. # 32, at 2.) They did not at this point conduct a formal warrantless search of the premises and the government does not seek to justify a warrantless search based on exigent circumstances. *See, e.g., United States v. Gaitan–Acevedo,* 148 F.3d 577, 584–85 (6th Cir.1998) (warrantless entry and search of hotel room justified because officers reasonably believed suspect, alert-ed to their presence through open phone line, would destroy drug evidence).

As Ellis, Butler, and the other officers entered the home, they found Ellis' seventeen-year-old daughter present. Officers permitted her to leave, and she did so, departing for her mother's house. (*Id.*) Several officers then swept the rest of the house, checking for the presence of anyone else. They found no one else. They did see marijuana growing in Ellis' basement, but did not seize it at the time. Nor did they attempt to use what they saw to justify a further search of Ellis' home at the time, or to support the warrant application. (*Id.* at 2–3; Def.'s Br., doc. # 30, at 6.) Their conduct was fully consistent with their stated purpose of a protective sweep.[3]

Butler then drove to the station to apply for a search warrant. (Def.'s Br., doc. # 30, at 6.) Butler's application for a search warrant did not include anything the officers saw during their protective sweep. While Butler was seeking a warrant, Ellis waited with officers in the living room of his home. (*Id.*) The parties agree that there was idle conversation during the wait, none of which the government seeks to use against Ellis. At one point during the wait, Kurylowicz's wife came into the house through a side door, attempting to warn Ellis that officers had spoken with her husband earlier in the day. When the officers encountered Kurylowicz's wife in

<hr/>

**3.** The parties dispute the meaning and significance for this case of the Supreme Court's decision in *Kentucky v. King,* —— U.S. ——, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). In *King,* the Supreme Court held that the presence of officers at the door of a dwelling can, in some cases, establish exigent circumstances justifying a warrantless entry of the dwelling, because inhabitants of the dwelling might begin destroying evidence upon realizing that law enforcement personnel are at the door. Stretched too far, that holding could permit warrantless entry almost anytime officers approach a dwelling or talk with the owner, whether in the course of a knock-and-talk or otherwise. Here, however, the Court need not consider what properly constitutes exigent circumstances after *King.* The KANET officers in this case legitimately used the protective sweep and detention to safeguard evidence; they did not use the claimed exigency as a pretext to evade the warrant requirement.

Ellis' home, they escorted her off the premises.

Butler returned to the house with the search warrant around midnight. (Report, doc. # 30–2, at 2.) The officers then searched the house and seized the marijuana plants growing in Ellis' basement, along with devices and materials used to grow them. (Resp., doc. # 32, at 3.) Officers told Ellis they wanted to talk with him, and that they would not arrest him that night. Butler then escorted Ellis out of the home, to a waiting, unlocked police vehicle. Ellis was not handcuffed or otherwise restrained at the time. Butler told Ellis he was not under arrest and was free to leave at any time. Butler also read Ellis his *Miranda* rights and obtained a written waiver of those rights from Ellis. Ellis then confessed to running an illegal grow operation out of his basement. (Report, doc. # 30–2, at 2–3.)

## III. ANALYSIS

Ellis seeks to suppress: (1) physical evidence seized from his home under the search warrant; (2) the confession he made to Butler after signing a written waiver of his *Miranda* rights; and (3) evidence of an incriminating statement he denies making at all upon learning that Butler was going to apply for a search warrant. (Mot. to Suppress, doc. # 29, at 1.) The Court finds no basis for suppression.

### A. Physical Evidence Obtained Under the Warrant

Ellis seeks to suppress the physical evidence discovered during execution of a search warrant. (Report, doc. # 30–2, at 3–4.) Ellis argues that the magistrate lacked probable cause to issue the warrant because the affidavit supporting the warrant request contained deliberately false and materially misleading information. (Def.'s Br., doc. # 30, at 21–22; Def.'s Reply Br., doc. # 40, at 16–19.) More

specifically, Ellis claims that one part of the affidavit—reporting that Ellis said, "You are gonna be taking me to jail for sure when you see what is down in the basement"—was false because he never said anything to the officers about going to jail or the contents of his basement. (Def.'s Br., doc. # 30, at 22.) Another part of the affidavit—noting that LEIN did not disclose a license for Ellis under the MMMA—was, according to Ellis, deliberately misleading, because Butler knew or should have known that Ellis was a licensed caregiver under the medical marijuana program, and that the LEIN would not necessarily disclose this. (*Id.*) Those defects in the affidavit, Ellis argues, invalidate the resulting warrant.

#### 1. The *Franks* challenge

 Search warrant affidavits are presumptively valid. *United States v. Rodriguez–Suazo*, 346 F.3d 637, 648 (6th Cir.2003). A reviewing court will only go behind the face of a search warrant where a defendant demonstrates: (1) that specified portions of the affidavit were deliberately or recklessly false; and (2) that the challenged statements were necessary to the issuing magistrate's finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). In this case, Ellis has not made either of the requisite showings.

 First, Ellis has not demonstrated the information in the affidavit was false, let alone "deliberately or recklessly false." *United States v. Stuart*, 507 F.3d 391 (6th Cir.2007). An officer's statement in an affidavit is "deliberately false" when the officer makes the statement knowing that it is untrue. Similarly, an officer displays reckless disregard for the truth when he "entertains serious doubts as to the truth of his allegations" in an affidavit. *United States v. Whitley*, 249 F.3d 614, 621 (7th Cir.2001); *Griffin v. City of Detroit*, No. 92–2062, 1993 WL 239069, at *4 (6th Cir.

June 30, 1993). Ellis denies telling the officers, "You are going to be taking me to jail for sure when you see what is down in the basement," but Butler testified credibly at the evidentiary hearing that Ellis said those words. Other officer testimony corroborated Butler on this point. The Court has found by a preponderance of the evidence that Ellis made the statement. Moreover, nothing else in the record suggests that Butler or the other officers manufactured the statement. To the contrary, even Ellis acknowledges that he informed the officers of his participation in Michigan's medical marijuana program.

Nor has Ellis established that Butler deliberately misled the magistrate by accurately reporting the outcome of the LEIN search. (Def.'s Br., doc. # 30, at 22.) All parties agree that Butler properly conducted the LEIN search and accurately reported the result, namely that LEIN did not disclose a MMMA license for Ellis. Ellis apparently objects that the accurate report was deliberately misleading because Butler knew or should have known that the LEIN listing was not comprehensive, and that Butler should have at least disclosed the limitations of the LEIN search in this context.

■ The Court rejects this claim for several reasons. First, regardless of whether Ellis has, or does not have, a license under the MMMA, it is still a crime under both Michigan and federal law to manufacture marijuana. *See King,* 804 N.W.2d 911, 914–15 (Mich.Ct.App.2011) (quoting *People v. Redden,* 290 Mich.App. 65, 799 N.W.2d 184, 199–200 (2010) (O'Connell, J., concurring)). As an affirmative defense, the MMMA merely has the potential to excuse a defendant's criminal act; it does not negate any element of the crime. *Casias,* 764 F.Supp.2d at 922. Thus, when a magistrate judge is asked to determine whether there is probable cause to believe that a suspect's home harbors evidence of the crime of manufacturing marijuana, MMMA licensure is really beside the point. As the Michigan Court of Appeals recently explained:

> [B]ecause the possession, manufacture, use, creation, and delivery of marijuana remain illegal in Michigan even after the enactment of the MMMA, a search-warrant affidavit concerning marijuana need not provide specific facts pertaining to the MMMA, i.e., facts from which a magistrate could conclude that the possession, manufacture, use, creation, or delivery is specifically not legal under the MMMA.

*People v. Brown,* 297 Mich.App. 670, 825 N.W.2d 91 (2012).

Accordingly, the allegedly misleading statement is not "necessary to the issuing magistrate's finding of probable cause," and cannot justify invalidating the warrant. *Franks,* 438 U.S. at 172, 98 S.Ct. 2674.[4]

---

4. Even if the magistrate judge had a duty under Michigan law to consider the MMMA affirmative defense—and, under *Brown,* the magistrate judge plainly has no such duty—it would not help Ellis here. This is a *federal* prosecution, so whether the warrant violated *state-law* requirements for establishing probable cause is immaterial. *See, e.g., United States v. Wright,* 16 F.3d 1429, 1434, 1437 (6th Cir.1994) ("The fact that [state] law may now require greater protection against search and seizures than the fourteenth amendment is of no avail to a defendant in federal court, under prosecution for a federal crime . . . . [The

violation of state search and seizure law] is irrelevant as long as the standards developed under the Federal Constitution [are] not offended."); *see also U.S. v. Padilla–Pena,* 129 F.3d 457, 464 (8th Cir.1997) ("We have consistently held that evidence obtained in violation of a state law is admissible in a federal criminal trial if the evidence was obtained without violating the Constitution or federal law."); *United States v. Rowell,* 903 F.2d 899, 902–03 (2d Cir.1990) (applying federal standards for probable cause to a state-issued warrant and affirming denial of suppression motion). Ellis' claim that his registration un-

Second, in any event, there is nothing misleading about the LEIN statement. Everyone agrees that Butler was accurate in reporting to the magistrate that LEIN did not show Ellis as having an MMMA license. Ellis' suggestion that Butler had to consult the MMMA registry, itself, and report his findings to the magistrate is legally untenable in Michigan because the MMMA expressly forbids officers from using the MMMA registry to support a search warrant. MICH. COMP. L. § 333.26426(g) ("Possession of, or application for, a registry identification card shall not constitute probable cause or reasonable suspicion, nor shall it be used to support the search of the person or property of the person possessing or applying for the registry identification card, or otherwise subject the person or property of the person to inspection by any local, county or state governmental agency."). Had the officers sought information from the registry and used it in the warrant affidavit, it would have flouted this express prohibition of the MMMA. Moreover, other parts of the warrant affidavit made it clear that Kurylowicz, who was named as a source of information in the warrant affidavit, believed that Ellis was an MMMA caregiver—with or without a license—and was simply "way over" the number of plants he was allowed to have. In sum, the affidavit fully and fairly disclosed the information Butler had, did not include any information prohibited by Michigan law, and gave the magistrate an accurate and materially complete record on which to base a judicial finding of probable cause.

### 2. Probable cause

█ Ellis has failed to point out anything in the warrant affidavit that was both deliberately or recklessly false and necessary to the magistrate's decision to issue the search warrant. The Court, therefore, has no basis to second-guess the warrant affidavit. Because the affidavit was sound, the warrant itself is presumptively valid and the Court will only set it aside if Ellis shows that the magistrate lacked a "substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir.2004); *see also United States v. Pelham*, 801 F.2d 875, 877 (6th Cir.1986) ("[A]n issuing magistrate's probable cause determination should be paid great deference by reviewing courts and should not be set aside unless arbitrarily exercised."). Ellis cannot make this showing.

█ The magistrate had a substantial basis for finding probable cause to search. An affidavit establishes search probable cause when "given all the circumstances set forth [therein,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In this case, the affidavit included Ellis' statement to the officers that he would be going to jail when they saw what was in his basement. (Search Warrant Aff., doc. # 30–1, at 3.) The context of this admission—including, without limitation, the LEIN report included in the affidavit—suggested Ellis was talking about marijuana. *See Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (defendant's admission of criminal wrongdoing may, by itself, establish probable cause). The affidavit included more, however. It repeated a statement from Kurylowicz—a named informant with firsthand knowledge of the crime alleged—corroborating Ellis' statement. *See Gates*, 462 U.S. at 234, 103 S.Ct. 2317 (noting that even where there is "doubt as to an informant's motives, his explicit and detailed

der the MMMA insulates him from federal prosecution in federal court is in error.

description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case."); *Pelham,* 801 F.2d at 878 (6th Cir.1986) ("When a witness has seen evidence in a specific location in the immediate past, and is willing to be named in the affidavit, the totality of the circumstances presents a substantial basis for conducting a search for that evidence."); *See United States v. Combs,* 369 F.3d 925, 938 (6th Cir.2004) (statement from witness corroborated by other information sufficient to establish probable cause). Viewed under the totality of the circumstances, and in light of the considerable deference due the magistrate's decision to issue a warrant, the statements by Ellis and Kurylowicz that were included in the affidavit established probable cause, independent of any further corroboration. Consequently, the warrant is valid and the physical evidence obtained pursuant to it is admissible. *United States v. Gunter,* 551 F.3d 472, 482 (6th Cir.2009). The Court denies Ellis' Motion to suppress the physical evidence found at his home.

### B. Admissibility of Ellis' Post–Waiver Confession

■ Ellis also seeks to suppress the confession he made after Butler returned with the search warrant and after Ellis signed a waiver of his *Miranda* rights. (Def.'s Br., doc. # 30, at 19–20.) Ellis claims that the confession was the product of two earlier unlawful acts by the KANET officers: (1) arresting him without probable cause by handcuffing him outside of his home before Butler left to seek a warrant, and (2) searching his home initially without a warrant. (*Id.* at 20.) Ellis says that he subsequently confessed to the illegal grow operations because he "was still experiencing the vestiges of the unlawful government conduct, and insufficient time had passed between the unlawful government conduct and the reading and waiving of his *Miranda* rights to dissipate the taint of the unlawful conduct." (*Id.*) Assuming, without deciding, that officers unconstitutionally detained Ellis and unconstitutionally swept his home before obtaining a warrant, Ellis' subsequent confession is still admissible because it was voluntary and not tainted by any arguable police misconduct.

■ Courts must suppress testimonial evidence obtained from a constitutional violation, even if the evidence is simply derived from the violation rather than the direct product of it. *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Kennedy,* 61 F.3d 494, 497 (6th Cir.1995). However, where the connection between testimonial evidence and an earlier constitutional violation is so attenuated that the evidence cannot fairly be considered the product of that violation, the exclusionary rule does not apply. *United States v. Akridge,* 346 F.3d 618, 625 (6th Cir.2003); *see also Segura v. United States,* 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (in deciding whether a confession is tainted by prior illegality, court must ask "whether the [confession] was come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."). To decide whether a voluntary confession is sufficiently attenuated from an earlier illegality to be admissible, a court should consider three factors to determine whether the confession is admissible: (1) the temporal proximity of the illegal activity and the challenged statement; (2) the presence of intervening circumstances; and, most importantly, (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Ellis cannot show a basis for exclusion under this standard, even assuming the officers violated the constitution by

detaining Ellis and conducting a pre-warrant protective sweep of his house.

### 1. Voluntariness

 The threshold issue for admission under *Brown* is that the confession must have been voluntary for purposes of the Fifth Amendment. *Brown*, 422 U.S. at 602, 95 S.Ct. 2254. Voluntariness is a touchstone of due process and a statement that is involuntarily given is inadmissible as evidence. *See, e.g., Lee v. Mississippi*, 332 U.S. 742, 745, 68 S.Ct. 300, 92 L.Ed. 330 (1948) ("The due process clause of the Fourteenth Amendment invalidates a state court conviction grounded in whole or in part upon a confession which is the product of other than reasoned and voluntary choice.").

> Determining whether a confession is "voluntary" for due process purposes entails an examination into the "totality of the circumstances" to determine whether the confession was procured by acceptable techniques that draw upon an essentially free and unconstrained choice, rather than by unacceptable tactics that extract their results from an overborne will. The critical line of distinction is between "self-direction" and "compulsion."

*Cooper v. Scroggy*, 845 F.2d 1385, 1390 (6th Cir.1988) (citing *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961)). There is no bright-line test for determining voluntariness and no single factor is dispositive on the point. Among the relevant factors in making the assessment are "the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of questioning; and the use of physical punishments, such as the deprivation of food or sleep." *United States v. Mahan*, 190 F.3d 416, 423 (6th Cir.1999).

Based on the facts found by the Court, Ellis' confession was voluntary for purposes of the Fifth Amendment. Ellis is a fully-capable adult with no discernible problems of comprehension. He was not handcuffed when he confessed, but, rather, was seated in the front of an unlocked police vehicle. He had been properly *Mirandized,* and had read and signed a written waiver of his *Miranda* rights. (Report, doc. # 30–2, at 2.) Furthermore, Butler had notified Ellis that he would not be arrested that evening and that he was free to terminate the interview at any time. The questioning did not last for any appreciable period of time and Ellis was aware throughout that he was free to end the encounter and leave the vehicle. There is, in short, no reason to believe Ellis' statement was anything but voluntary.

### 2. Application of the *Brown* factors

 Even if a confession is voluntary in fact when considered under the totality of the circumstances, the Court still must suppress the confession if it can be fairly traced, either directly or derivatively, to unconstitutional police conduct, such as an unreasonable search or seizure. To determine whether a confession is fairly traceable to unlawful police conduct, courts look to the three factors outlined in *Brown*. The first *Brown* factor is the temporal proximity of the allegedly illegal police conduct and the defendant's confession. *Brown*, 422 U.S. at 604, 95 S.Ct. 2254. This factor is the only one of the *Brown* criteria that offers Ellis any potential solace, but it is also typically the least important of the three considerations for determining purgation. *See, e.g., United States v. Shaw,* 464 F.3d 615, 627–28 (6th Cir.2006). Moreover, in this case, even this factor only weakly favors Ellis. Although only a few hours separated Ellis' alleged arrest from his confession, that

time was spent, not in the back of a police car or on a cold, outdoor porch, but in his own home, seated on his own couch. That fact, coupled with the time separating the alleged arrest from the confession, militates against giving much weight to the temporal proximity factor in this analysis. *See Rawlings v. Kentucky,* 448 U.S. 98, 107–08, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (holding that the relatively non-threatening, congenial atmosphere of a 45 minute detention that preceded a confession adequately attenuated the preceding illegal detention). Even assuming the initial decisions, two hours earlier, to detain Ellis and conduct a sweep of his home had violated the constitution—and the Court has decided it did not—the initial force of that decision had likely dissipated substantially by the time Ellis confessed.

The second factor—presence of intervening circumstances—weighs against suppression of Ellis' confession. *Brown,* 422 U.S. at 604, 95 S.Ct. 2254. After the initial detention and house sweep, Ellis and the officers spent two hours together. They were in Ellis' home, presumably the most comfortable place for Ellis to be. He and the officers engaged in idle small talk. More importantly, before asking to talk with Ellis, Butler plainly told Ellis that he was not under arrest and that he would not be arrested that night. Butler told Ellis he could leave at any time, read him his *Miranda* rights, and had Ellis read and sign a written waiver of those rights. (Report, doc. # 30–2, at 2.) Only then did the interview occur during which Ellis confessed to illegally growing marijuana. These intervening circumstances, taken as a whole, readily purge any allegedly unconstitutional taint from earlier that evening. *Cf. United States v. Wolfe,* 166 Fed.Appx. 228, 235 (6th Cir.2006) (unreported) (defendant's decision, upon being released from custody, to take a polygraph examination was an "intervening independent

act of free will to purge the primary taint of [an] illegal detention").

The third and most important *Brown* criterion is the purpose and flagrancy of the official misconduct. *Brown,* 422 U.S. at 604, 95 S.Ct. 2254. Relevant considerations under this criterion are whether "the arrest, both in design and in execution, was investigatory," and whether the arrest was calculated "to cause surprise, fright, and confusion." *Id.* at 605, 95 S.Ct. 2254. This factor weighs heavily against suppression. The record—particularly the testimony of KANET officers—reveals that the officers did not arrest or otherwise detain Ellis for investigatory purposes, but rather to protect themselves and potential evidence at the scene. (Resp., doc. # 32, at 3–7.) The aim was not to surprise or frighten Ellis, but ensure that the situation remained under control pending a decision on the warrant application. (*Id.*) Similarly, the officers' initial sweep of the house was not for purposes of discovering evidence or scaring Ellis into a confession. The initial sweep—like the detention—was to protect the officers and the evidence. (*Id.* at 3–4.) Both of those aims are legitimate bases for conducting a sweep of a residence. *See United States v. Williams,* 354 F.3d 497, 503 (6th Cir.2003); *United States v. Johnson,* 22 F.3d 674, 680 (6th Cir.1994). Moreover, Butler made no use in his warrant application of what the officers saw during their protective sweep. So even assuming the detention or the sweep violated a constitutional protection—and the Court has made no such determination—the violation was anything but flagrant.

Ellis voluntarily confessed to Butler after waiving his *Miranda* rights orally and in writing. At the time he confessed, the taint from any alleged unconstitutional conduct earlier in the evening had dissipat-

ed. Accordingly, his Motion to Suppress the confession is denied.

## C. Ellis' Pre–Warrant Statement to the Officers

Ellis also seeks to suppress the statement—"You are gonna be taking me to jail for sure now when you see what is down in the basement"—he made when he learned that Butler was going to apply for a search warrant. (*See* Resp., doc. # 32, at 2.) The Court has found by a preponderance of the evidence at the suppression hearing that he made the statement, but Ellis maintains he did not. The jury will ultimately have the chance to evaluate and resolve the issue if it matters in the jury's assessment of whether the government has met its burden of proof beyond a reasonable doubt. *See United States v. Case*, 2:07–cr–111, 2008 WL 5050095, at *1 (E.D.Tenn. Nov. 19, 2008) ("Defendant testified that he never made this statement, which is clearly beyond the office of a suppression hearing; whether or not he made the statement is for the jury to decide."). But the question remains: how does the Court properly evaluate a request to suppress a statement the defendant says he never made in the first place? *See Crisp v. United States*, 1:04–cv–218, 2006 WL 2548322, at *8 (E.D.Tenn. Aug. 30, 2006) ("This argument is curious because, as already mentioned, Defendant argues he never made the statement. If the statement was never made, then why would counsel need to suppress it?"). For purposes of Ellis' Motion, the Court will address each of Ellis' claimed bases for suppression on the assumption that he made the statement. Ellis' first basis for suppression is that the statement was the product of an unlawful arrest. His second basis for suppressing the statement is that the statement is the product of a custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Neither ground warrants suppression.

### 1. Was the statement a fruit of Ellis' unlawful arrest?

To arrest an individual, law enforcement officers must have probable cause to believe the individual has committed or is committing a crime. *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir.1995). An arrest that occurs without probable cause is invalid and the testimonial fruits of the arrest must be suppressed pursuant to the exclusionary rule. *Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. 407. Not every official detention rises to the level of an arrest, however, and police may lawfully detain individuals—even to the point of handcuffing them or securing them in a locked police vehicle—on less-than-probable cause under certain conditions. *See, e.g., United States v. Atchley*, 474 F.3d 840, 849 (6th Cir.2007) (use of handcuffs to detain defendant as safety precaution not unlawful where police had a reasonable suspicion defendant was engaged in illegal activity). For example, police officers may lawfully detain an individual to ensure their own safety or to secure the site of an ongoing investigation, so long as the detention is not unreasonably burdensome. *See, e.g., Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Whether a form of detention is reasonable depends on whether the governmental interest outweighs the intrusion resulting from the detention. *Muehler v. Mena*, 544 U.S. 93, 99, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005).

Ellis alleges that he was under an unlawful arrest when he made the challenged statement, as officers handcuffed him and took him then or shortly thereafter. (Def.'s Br., doc. # 30, at 9–15.) The Court disagrees. The testimony from the officers at the evidentiary hearing established that they initially handcuffed Ellis

as part of a routine effort to secure the area and to neutralize any risk of destruction of evidence. (Resp., doc. # 32, at 2.) Detention undertaken for those limited purposes is not an arrest, but a more limited stop that is justified so long as officers believe it is reasonably necessary to secure the scene and ensure the safety of officers and others. *Bletz v. Gribble,* 641 F.3d 743, 755 (6th Cir.2011). Based on the officers' testimony, the Court believes that the officers reasonably perceived that Ellis might become violent or disruptive if left unrestrained, as well as the possibility that other individuals in the home might emerge who would require all the officers' attention. Because the officers had a reasonable suspicion that handcuffing Ellis was necessary to further both of these legitimate objectives, and because handcuffing him was not—at least in the short-term—an unreasonably burdensome form of detention, the officers' handcuffing of Ellis was initially constitutional. *See Muehler,* 544 U.S. at 99, 125 S.Ct. 1465 ("The officers' use of force in the form of handcuffs to effectuate [the defendant's] detention in the garage, as well as the detention of the three other occupants, was reasonable because the governmental interests outweigh the marginal intrusion.").

■■■ Ellis argues that the duration of the handcuffing and detention transformed the initial detention into a full-blown arrest. (Def.'s Br., doc. # 30, at 11–12.)

Assuming, without deciding, that the detention did, at some point, become an unlawful detention or arrest, suppression of the challenged statement is still not warranted, because, when Ellis made the statement, the detention had not yet ripened into an arrest.[5] At the time Ellis mentioned the contraband in his basement, KANET officers were still in the process of securing the home and any evidence it contained. (*Id.* at 2.) The statement was made seconds—or at most minutes—after the initial detention. Because Ellis was not under arrest when he made the statement—merely detained for reasons of officer safety and evidence protection—the statement, itself, cannot be the fruit of an illegal arrest. Consequently, it may be admitted without violating Ellis' Fourth Amendment rights.

### 2. Was the statement obtained in violation of *Miranda?*

■■■ In the alternative, Ellis argues that use of the statement would be a violation of his Fifth Amendment *Miranda* rights. Under *Miranda,* statements made by a defendant during custodial interrogation are inadmissible at trial unless the prosecution can demonstrate the use of established procedural safeguards effective to secure the defendant's Fifth Amendment privilege against self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 444–45,

---

**5.** In any event, KANET officers may well have had probable cause to arrest Ellis based simply on his having told them that he was growing marijuana under the MMMA. (Def.'s Br., doc. # 30, at 4–5.) When a defendant admits to committing a crime, that admission, alone, suffices to establish probable cause to arrest. *United States v. Harris,* 403 U.S. 573, 583, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Growing marijuana is a crime under federal law and Michigan state law. *See* 21 U.S.C. § 841 *et seq.;* MICH. COMP. L. § 335.301 *et seq.* Because Ellis admitted to growing marijuana in his home, the officers may well have had

probable cause to arrest him for breaking state and federal law. The Court recognizes that the MMMA purports to limit this possibility under state law. MICH. COMP. L. § 333.26426(g). However, it is not clear how Michigan courts will apply this. *See, e.g., People v. Brown,* 297 Mich.App. 670, 825 N.W.2d 91 (2012). Moreover, this is a federal, not a state, prosecution and there is no question the officers had probable cause to believe Ellis was violating federal law once he admitted his participation in Michigan's medical marijuana program.

86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A defendant is "in custody" for purposes of *Miranda* when, given the circumstances surrounding the defendant's encounter with police, a reasonable person in his shoes would have felt that he was not at liberty to terminate the encounter. *Yarborough v. Alvarado,* 541 U.S. 652, 662, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *see also Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) ("ultimate inquiry" in custody determination is, "was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest"). "Interrogation" occurs whenever police say any words or take any actions that they should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis,* 446 U.S. 291, 301–02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

Ellis asserts, and the government does not deny, that he was in custody when he made the statement at issue, and that he had not, at that point, been read his *Miranda* rights. (Resp., doc. # 32, at 19.) Even so, *Miranda* does not require suppression in this case because Ellis did not make the statement in response to official interrogation. Ellis has not come forward with any evidence establishing that a KA-NET agent "deliberately elicited" the statement in question by some earlier remark. *See Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682 (" 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."). In particular, he has not shown that Butler's statement (about going to get a warrant) is reasonably understood as "express questioning or its functional equivalent." *Id.* at 300–01, 100 S.Ct. 1682. Rather than inviting a response from Ellis, Butler's statement simply alerted him—truthfully—of what was going on and what to expect next. Such a routine, matter-of-course statement cannot be sufficiently compulsive to qualify as "interrogation" under *Miranda. See United States v. Hurst,* 228 F.3d 751, 760 (6th Cir.2000) ("[T]he mere statement by [the officer] that 'we've got good information on you,' viewed in context, contains no compulsive element suggesting a Fifth Amendment violation under the circumstances."). Ellis' statement was a spontaneous admission made in response to Butler's statement about the next step in the investigatory process.

Because Ellis' statement was the product of neither an unlawful arrest, nor improper official interrogation, there is no basis for suppression.[6] The Court, therefore, denies Ellis' Motion to suppress evidence of his statement implying there was contraband in his basement. Of course, if the case goes to trial, and if Ellis chooses to testify at trial, he is free to deny making the statement, as he did at the evidentiary hearing.

**ACCORDINGLY, IT IS ORDERED** that Defendant's Motion to Suppress (doc. # 29) is **DENIED.**

---

[6.] Even had the Court decided that Ellis' statement was obtained in violation of *Miranda,* moreover, that conclusion would not compel suppression of any of the physical evidence obtained as a result of that statement. *See United States v. Patane,* 542 U.S. 630, 637, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (failure to give suspect *Miranda* warnings does not require suppression of physical fruits of suspect's unwarned but voluntary statements). Accordingly, the effect of ruling that the statement resulted from a *Miranda* violation would be limited to excluding evidence of the statement, itself.